ANDERSON, JULIAN & HULL, LLP
Brian K. Julian
bjulian@ajhlaw.com
250 South Fifth St., Suite 700
P.O. Box 7426
Boise, Idaho 83707-7426
Telephone: (208) 344-5800
Fax: (208) 344-5510
Julian - ISB #2360

FOLGER LEVIN & KAHN LLP
Gregory D. Call
gcall@flk.com
David P. Barton
dbarton@flk.com
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ST. LUKE'S MAGIC VALLEY REGIONAL MEDICAL CENTER (formerly MAGIC VALLEY REGIONAL MEDICAL CENTER),<br><br>Plaintiff,<br><br>v.<br><br>THOMAS R. LUCIANI; STAMPER, RUBENS, STOCKER & SMITH, P.S.; STAMPER, RUBENS P.S.; STOCKER, SMITH, LUCIANI & STAUB, P.L.L.C. | 8-30<br><br>**COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY, AND PROFESSIONAL MALPRACTICE** |

Plaintiff St. Luke's Magic Valley Regional Medical Center, Ltd., an Idaho nonprofit corporation, for its complaint against Defendants Tom Luciani, an individual; Stamper, Rubens, Stocker & Smith, P.S., a Washington Professional Service organization; Stamper, Rubens, P.S., a Washington Professional Service organization; and Stocker, Smith, Luciani & Staub, P.L.L.C., a

- 1 -

Washington Professional Limited Liability Corporation, alleges as follows:

## I.   PARTIES

1. Plaintiff St. Luke's Magic Valley Regional Medical Center is an Idaho nonprofit corporation. It is a 213 bed hospital located in Twin Falls, Idaho, and the only full service medical facility in its eight county area. The hospital has served the community since 1918. The hospital was previously known as Magic Valley Regional Medical Center, but took the name St. Luke's Magic Valley Regional Medical Center when it became part of the St. Luke's Health System in a transaction that closed on July 1, 2006. Prior to that time, the hospital was owned by the County of Twin Falls. Under the 2006 transaction, the County of Twin Falls leased the real property comprising the campus of Magic Valley Regional Medical Center to St. Luke's Magic Valley Regional Medical Center until a new 175 bed hospital is constructed, but for a minimum of five years. The deal provided that St. Luke's Magic Valley Regional Medical Center shall assume "all debts, liabilities and obligations of" Magic Valley Regional Medical Center, including "any fines, penalties and punitive, consequential and other special damages," and that it shall assume the "contracts, agreement and leases" of Magic Valley Regional Medical Center.

2. Defendant Tom Luciani is an attorney licensed to practice law in Idaho and Washington. He and his firm, Defendant Stamper, Rubens, Stocker & Smith, were hired by Farmers in July of 2003 to represent the hospital in the underlying litigation.

3. Defendant Stamper, Rubens, Stocker & Smith, P.S. is or was a law firm based in Spokane, Washington, with a business address of W. 720 Boone, Suite 200, Spokane, WA 99201, and is or was a Washington Professional Service organization. Tom Luciani was a partner in the firm of Stamper, Rubens, Stocker & Smith during the time he was engaged to defend Magic Valley in the underlying actions.

4. Plaintiff is informed and believes and on that basis alleges that Defendant Stamper, Rubens P.S. is a law firm based in Spokane, Washington, with a business address of W. 720 Boone, Suite 200, Spokane, Washington, and is a Washington Professional Service organization. Plaintiff is informed and believes and on that basis alleges that Defendant Stamper, Rubens P.S. has assumed certain liabilities of Stamper, Rubens, Stocker & Smith, P.S.

Plaintiff is informed and believes and on that basis alleges that Defendant Stocker, Smith, Luciani & Staub, P.L.L.C. is a law firm based in Spokane, Washington, with a business address of 312 W. Sprague Ave., Spokane, WA 99201, and is a Washington Professional Limited Liability Corporation. Plaintiff is informed and believed and on that basis alleges that Defendant Luciani is a principal of the firm of Stocker, Smith, Luciani & Staub, P.L.L.C, and that the firm of Stocker, Smith, Luciani & Staub, P.L.L.C. has assumed certain liabilities of Stamper, Rubens, Stocker & Smith, P.S.

## II.  JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. 1391(a)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Assignment of this action to the Southern Division is appropriate pursuant to Dist. Idaho Loc. Civ. R. 3.1, because a substantial part of the events giving rise to the claims alleged herein occurred in Boise.

## III.  INTRODUCTION

7. In July of 2003, Defendant Tom Luciani was chosen by St. Luke's Magic Valley Regional Medical Center's insurer, Farmers, to substitute in as counsel to defend the hospital in three underlying actions, including a *qui tam* action in Idaho Federal Court alleging violations of the Federal False Claims Act. Luciani and his firm had a longstanding relationship with Farmers (which had recently taken over the defense from another insurer, Travelers). Mr. Luciani put that relationship with Farmers ahead of his duty to his client and failed to provide his client with an adequate defense.

8. Knowing that Farmers took the position that it had a duty to defend the *qui tam* action but no duty to indemnify its insured, Luciani worked in concert with Farmers to provide a cheap and inadequate defense to his client. The strategy benefited Farmers at the expense of St.

Luke's Magic Valley Regional Medical Center ("Magic Valley," or the "hospital"), which bore the risk of a large judgment.

9. Luciani's failures led to a crisis for the hospital. On January 9, 2006, Magic Valley received reports prepared by experts retained by plaintiffs in the underlying litigation. The reports alleged that Magic Valley risked a $22 million judgment, including damages related to false billing under the Federal False Claims Act of more than $18 million. Magic Valley also learned that Luciani had neither identified nor engaged experts to rebut the reports, although the deadline for disclosing expert reports was less than a month away. Magic Valley risked a $22 million judgment and no statistical analysis of its records had been conducted and none was planned.

10. Faced with a crisis threatening the future of the hospital, Plaintiff retained experienced False Claims Act counsel who engaged an auditing expert capable of developing and performing a statistically valid audit to assess Magic Valley's exposure and rebut the False Claims Act allegations. After several months, new counsel, McDermott, Will & Emery, LLP ("McDermott"), was able to right the ship. McDermott discredited the underlying plaintiffs' expert so thoroughly that plaintiffs fired him, and the statistically valid audit that was performed demonstrates that the False Claims Act allegations are false.

11. Farmers refused payment for any fees and costs incurred by McDermott and Coding Compliance, and the hospital has not fully recovered these fees and costs from any other insurer or source.

12. The expenses the hospital has incurred and will incur for legal services provided by McDermott and Coding Compliance would not have been incurred absent Defendants' breaches of duty. Defendants are responsible for these costs.

### IV.   FACTUAL ALLEGATIONS

**A.   The Underlying Litigation**

13. In March of 2001, Cherri Suter and Melinda Harmer were dismissed from their employment with Magic Valley. Magic Valley had learned that Suter and Harmer were using hospital employees to operate their own business for their own financial gain. In August of 2001,

- 4 -

Suter and Harmer filed suit in Idaho state court, alleging retaliatory discharge and various causes of action in connection with alleged breaches of their employment contracts (the "state employment action"). The action is *Suter and Harmer, et al. v. Magic Valley Regional Medical Center, et al.*, Case Number CV-01-2959, Idaho State Court, County of Twin Falls.

14. In January of 2003, Cherri Suter and Melinda Harmer filed a new action in Federal Court, *United States of America, ex rel. Cherri Suter and Melinda Harmer v. National Rehab Partners Inc. and Magic Valley Regional Medical Center*, Action No. CV-00015-BLW-MHW, United States District Court for the District of Idaho. The new action alleged that Magic Valley violated provisions of the Federal False Claims Act by submitting claims for reimbursement to Medicare for rehabilitation services provided in the Transitional Care Unit from July 1998 through October 2000. The Transitional Care Unit is a skilled nursing facility for patients discharged from acute care units, but who still require additional care or rehabilitation. Suter and Harmer brought the suit as a *qui tam* action, in the name of the United States government. This suit is referred to herein as the "False Claims Act litigation," the "False Claims Act action" or the "*qui tam* action."

15. The complaint in the Federal False Claims Act action does not include a calculation of alleged damages. Rather, it requests a penalty for "each violation" of the False Claims Act without stating how many violations are alleged. The complaint stated, as its prayer for relief:

Wherefore, Relators pray for judgment against Defendants as follows:

1. That this court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions;

2. That the court enter judgment against Defendants for a civil penalty of not less than $5,000 and not more than $10,000 for each violation of 31 U.S.C. 3729;

3. That Relators be awarded all costs and expenses of this action, including attorney fees; and

4. That the United States and Relators receive all such other relief as the court deems just and proper.

- 5 -

16. In March of 2003, Suter and Harmer filed a second complaint in Idaho federal court, *Cherri Suter, Randy Suter, Mindy Harmer, Eric Herzog and Cornerstone Therapy, LLC v. Magic Valley Regional Medical Center*, Action No. CV-00128-BLW, United States District Court for the District of Idaho. This complaint included various causes of action for wrongful termination and breach of an employment contract. The Idaho state employment action was stayed pending resolution of this federal employment action. The federal employment action was subsequently consolidated with Suter and Harmer's Federal False Claims Act action.

**B.  Magic Valley Is Insured Under A Comprehensive Liability Policy Issued By Farmers And A Healthcare, Directors, Officers and Trustees Policy Issued By Travelers.**

17. During all relevant times, Magic Valley was insured under Policy Number 1170-1112 and 1170-1112E1, a Comprehensive Hospital Liability Policy issued by Farmers. The Policy includes coverage for personal injury liability, hospital and professional liability, property damage liability, and employee benefit liability. It provides primary coverage of $1,000,000 per occurrence, and excess coverage of $9,000,000 per occurrence. The policy provides that amounts incurred in defense of Magic Valley are "in addition of the applicable limit of liability" of the policy.

18. During all relevant times, Magic Valley has also been insured by Travelers under a claims made Healthcare Directors, Officers and Trustees Protection PLUS+ Policy, Number 081 LB 103073057B, providing a $5,000,000 maximum aggregate limit of liability for all claims. The Travelers policy provides that it "shall pay on behalf of the Insured Persons Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, including Wrongful Employment Practices. . . ." It defines a "Claim" to include "a civil proceeding commenced by services of a complaint or similar pleading," and a "Wrongful Act" to include "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty. . . ." Magic Valley purchased a "Duty to Defend Endorsement" obligating Travelers "to defend any Claim, even if such Claim is groundless, false or fraudulent. . . ."

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

**C.    In 2003, Farmers Replaced The Firm That Had Been Handling The Underlying Litigation With Tom Luciani, Whose Firm Farmers Regularly Used To Handle Defense Work.**

19.    In the early stages of the underlying litigation, Travelers retained the firm of Hawley, Troxell, Ennis & Hawley to defend the underlying litigation. Farmers subsequently took over the defense of the underlying litigation and for a time continued to retain the Hawley Troxell firm.

20.    In July of 2003 Farmers replaced Hawley Troxell with Defendant Stamper, Rubens, Socker & Smith, with which Farmers had a longstanding relationship. Tom Luciani, an attorney at Stamper, Rubens, Stocker & Smith, took over the defense of the underlying litigation.

21.    Mr. Luciani had experience in handling employment cases and medical malpractice cases, but he had no relevant experience in defending Federal False Claims Act matters. The defense of health-care related False Claims Act matters is a highly specialized field, and a limited number of large firms nationwide have substantial experience and expertise in complex medical billing actions under the False Claims Act. To practice successfully in this area a firm must combine expertise in government and private False Claims Act litigation with expertise in the area of health care regulatory and reimbursement law. In communications not shared with Magic Valley, Luciani acknowledged the complexity of the case. As he said in a July 21, 2004 letter to Farmers not copied to Magic Valley: "[A]s we discussed on the telephone, this is an incredibly complex case because of the nature of the allegations, the numerous witnesses and the mind-boggling regulations that form the basis for the Medicare submissions in question."

22.    Demonstrating his lack of expertise in False Claims Act litigation, Luciani failed to file any challenges to the pleadings in the False Claims Act litigation, despite the fact that a significant percentage of False Claims Act cases are dismissed on the pleadings. Potential grounds for dismissal of the underlying action included the following: (a) some of the claims are based on published guidance and sometimes on a preamble rather than the actual statute; (b) there was no protected conduct and no retaliation; (c) Plaintiff Suter is not an "original source" of the information regarding overbilling as required under the False Claims Act; (d) the alleged mistakes did not result in any overbilling for which the government could claim reimbursement.

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

     **D.    From The Very Beginning Of His Involvement In The Underlying Litigation, Luciani Regarded Farmers As His Real Client; He Kept Farmers, But Not Magic Valley, Up To Date On Key Developments.**

23.    From the moment he began representing Magic Valley in the underlying actions, Luciani regarded his real client as Farmers. Luciani opened a new file for the matter on July 9, 2003, using a Stamper, Rubens, Stocker & Smith, P.S. form titled "New File Information." The form has a line for "CLIENT NAME," but the only entry on that line is "Farmers Insurance / Claim No. A 5 010574." The filled-in form contains contact information for Ron Fulkerson, the claims representative assigned by Farmers to handle the claim. The form contains no contact information for Magic Valley Regional Medical Center. The file folders maintained by Mr. Luciani in the underlying litigation are labeled "FARMERS: Magic Valley."

24.    Consistent with his view that his real "client" was Farmers, Luciani sent regular updates to Farmers but <u>not</u> to Magic Valley. Luciani provided detailed updates to Farmers by letters dated July 21, 2004, June 1, 2005, August 2, 2005, August 25, 2005, and February 8, 2006. The letters discuss the factual background of the case, summarize deposition testimony, discuss settlement options and strategy, and contain Mr. Luciani's "Recommendation[s] As To Future Handling." Neither Luciani nor Farmers shared any of these written updates with Magic Valley.

     **E.    Knowing That Farmers Took The Position That Its Obligation Was For Defense Costs Only, Luciani Acted In Concert With His "Client" Farmers To Devise A Cheap Litigation Strategy That Protected Farmers But Placed The Hospital At Risk Of A Large Judgment.**

25.    Luciani was aware that Farmers believed that it had no indemnity obligation in the False Claims Act litigation. In fact, he agreed with Farmers on that point and actively encouraged Farmers to avoid any obligation for payments to plaintiffs attributable to their False Claims Act allegations. In a February 8, 2006 letter to Farmers not shared with Magic Valley, Mr. Luciani states, under the heading "RECOMMENDATION," that he did not believe the insurer should provide indemnity for any payment relating to the False Claims Act allegations, even where such payments are intended to settle plaintiffs' employment-related claims. As Mr. Luciani explained, he did "not believe the insurer should contribute to over billing charges that are misclassified as lost wages or business value."

- 8 -

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

### 1. Luciani Sent Reports To Farmers, But <u>Not</u> To Magic Valley, Showing The Potential For A Multi-Million Dollar Judgment In The *Qui Tam* Action.

26. From 2003 to 2006, upon inquiries from Magic Valley, Tom Luciani informed Magic Valley that its exposure was in the range of $300,000 to $500,000.

27. In contrast, Mr. Luciani revealed to Farmers that Magic Valley's potential exposure was uncertain and far greater. In a July 21, 2004 letter to Farmers' Special Claims Representative at the time, Roger Dexter, Mr. Luciani explained that Suter and Harmer's employment and breach of contract claims have a value in the $200,000 to $300,000 range. He then wrote:

> However, the foregoing amounts are negligible in terms of the potential recovery under the *qui tam* cause of action. The base recovery is calculated upon the amount of each claim the government was fraudulently induced to pay, which in this case involves claims submitted for approximately 1,200 patients. Those amounts may be tripled, and each false claim is subject to a penalty of between $5,000 and $10,000. Finally, a successful plaintiff is entitled to recover attorney fees and costs. Although it is nearly impossible to estimate the total exposure based upon the minimal information known to date, the potential top-end may be in the millions of dollars.

If one assumes that that just <u>one</u> false claim was submitted for each of the 1200 patients, that the amount of the error in each case was just <u>one</u> dollar, and that a penalty of $10,000 would apply to each false claim, then Mr. Luciani's letter was predicting an exposure of $12,001,200 plus attorney's fees. Yet neither Mr. Luciani nor Roger Dexter sent this letter to anyone at Magic Valley.

### 2. Despite The Potential For A Multi-Million Dollar Judgment, Luciani And Farmers Settled On A Strategy That Minimized Defense Costs.

28. In September of 2003, shortly after Luciani was retained, Farmers announced that it was withdrawing from the professional liability insurance market in Idaho, and that it had ceased issuing new policies and would stop renewals as of January 1, 2004. Farmers was no longer seeking Magic Valley's repeat business, and the defense of the False Claims Act litigation became simply an expense it sought to minimize. To help achieve its goal of minimizing costs, in

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

1   2005 Farmers hired the Los Angeles firm of LitNeutral to act as its claims handler. On its
2   website, that firm advertises itself to insurance companies that are:

- "pulling out of a line of coverage, a state, or the business entirely"
- "seeking a partner willing to put substantive skin in the game"
- "seeking a partner that moves fast and shares the risk"
- "looking to contain costs and gain competitive advantage"
- "seeking a partner willing to tie pay to performance"

29. Regarding Farmers as his client, Luciani facilitated Farmers' desire for a cheap defense, even if the defense was inadequate to protect the hospital. He worked closely with Farmers' agents, including Dave Johnson of LitNeutral, to implement a strategy that saved defense costs, but exposed the hospital to substantial risk.

30. Luciani was willing to abide by Farmers' "Billing Guidelines for Professional Liability Cases." Despite the complexities of False Claims Act litigation, the Guidelines impose strict limitations on the costs of defense. For example, they provide that a single attorney designated by Farmers must "do all of the work on a case" from "start to finish." And although the defense of this case required the review of voluminous medical records and bills, the Guidelines state that Farmers will not pay for time spent in the "reviewing/analyzing of documents." Luciani never sought leave from Farmers to depart from the standard billing guidelines. The Guidelines are not included or mentioned in the policy by which Farmers insured Magic Valley, and Luciani never forwarded them to Magic Valley or informed Magic Valley of their contents.

31. Luciani conducted almost no offensive discovery. He failed to seek all relevant records, and although he deposed plaintiffs Suter and Harmer, he failed to conduct thorough examinations.

32. When the Hawley Troxell firm turned the reins over to Mr. Luciani, it advised him in a letter dated August 5, 2003 of the need for an expert report to rebut plaintiffs' False Claims Act allegations. However, Mr. Luciani never did retain an expert or begin a search for an expert to rebut the plaintiffs' False Claims Act allegations.

- 10 -

33. Instead, Luciani advised Magic Valley that it would be a bad idea to hire an expert to conduct an audit of the TCU's billing practices, because, he said, the audit would only confirm Plaintiffs' theories of false billing. Luciani had little ground for this assertion (which turned out to be false), since he had never undertaken any meaningful investigation of Magic Valley's billing. While an audit of thousands of patient records would necessarily be expensive, such an audit was at the heart of the defense of this False Claims Act case, because the plaintiffs alleged that Magic Valley used improper billing practices for cases being treated in the Transitional Care Unit. Thus, comparing Magic Valley's billing process with applicable billing regulations was necessary to mount and present a substantive defense.

34. But Luciani relied on a cheaper strategy: deflecting liability onto a co-defendant in the underlying litigation, National Rehab Partners, a contractor employed by the hospital to perform certain billing functions. Luciani knew that this strategy was flawed, and he pursued it despite his awareness that the hospital's duties under the applicable billing rules are non-delegable, and despite his awareness that National Rehab Partners was nearly bankrupt. Luciani did not advise the hospital of these strategic flaws until January of 2006, when, at the hospital's request he forwarded underlying plaintiffs' expert reports alleging damages in the neighborhood of $22 million. As Mr. Luciani wrote in his cover letter, the reports "present the following problems: . . . Rebutting the assertion that we knowingly or recklessly submitted false claims based on the conduct of contract vendors and their employees, in the face of allegations that we had no mechanism in place to supervise such conduct; and . . . [e]ffectively mediating in an environment where the responsible co-defendant is self-insured and not believed to have the monetary assets required to contribute in an amount that would permit settlement. Consequently, mediation is doomed to fail. . . ." Luciani's letter proposed no solutions to these problems and proposed no change in strategy.

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

**F. On January 9, 2006, Magic Valley Learned That Its Very Future Was At Stake: Suter And Harmer's Expert Reports Showed Potential Exposure In The Amount Of $22 Million, No Rebuttal Expert Had Been Identified, And The Deadline For Disclosure Of Its Own Expert Reports Was One Month Away.**

35. Thirteen days after the underlying plaintiffs' expert reports were sent to him, Luciani phoned Magic Valley to summarize their contents. Magic Valley received the reports three days later, on January 9, 2006, after requesting that they be sent by Federal Express. They included a report from Suter and Harmer's expert, Mr. Nicholson, claiming damages relating to false billing in the amount of $18,199,266. Taking into account Suter and Harmer's other claims and the False Claims Act provision for recovery of attorney's fees, the report indicated that Magic Valley faced exposure in the neighborhood of $22 million.

36. The deadline for disclosure of Magic Valley's own expert reports was February 6, 2006. Neither Farmers nor Mr. Luciani had identified or retained an expert capable of conducting an audit to rebut the False Claims Act allegations.

37. A $22,000,000 judgment was large enough to threaten the very existence of the hospital, yet Luciani had failed to initiate necessary steps to prepare a defense or to develop facts for the defense.

**G. Responding To The Emergency Created By Luciani's Incompetent And Conflicted Defense, Magic Valley Retained The Firm Of McDermott, Will & Emery, LLP, Who Successfully Managed The Crisis.**

38. In the days after January 9, 2006, Tom Luciani continued to advise the hospital that despite the alleged $22 million in damages, there was no need to change course or to conduct an audit of Magic Valley's billing.

39. Uncertain as to whether the course of action recommended by Luciani was wise, Magic Valley conducted an investigation to identify counsel experienced in False Claims Act litigation to provide a second assessment. In the process, Magic Valley discovered that the market was small – only a few firms in the nation had expertise in defending major health-care related False Claims Act cases. Magic Valley identified three firms with the necessary expertise – Sidley Austin, LLP; Jones Day, LLP; and McDermott, Will and Emery, LLP. It decided on the latter. McDermott assessed the situation and informed Magic Valley that in their view it was

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

absolutely necessary to conduct a statistically valid audit in order to rebut Mr. Nicholson's report. It identified the firm of Coding Compliance Solutions as capable of conducting the audit, but also advised that it was not possible to prepare the necessary report before the deadline on February 6. McDermott therefore conditioned its acceptance of a formal engagement on obtaining relief from the February 6 deadline. Meanwhile, a brief extension until mid-March was granted after the parties agreed to participate in a mediation on March 6 and 7, 2006. McDermott and Coding Compliance began providing services on behalf of Magic Valley on January 18, 2006, and were formally engaged on January 30, 2006.

40. Although Luciani continued to advise the hospital that no change in strategy was necessary, he acknowledged in a February 8 letter to LitNeutral (not shared with Magic Valley) that "the potential exists for a verdict in favor of the plaintiffs" on the False Claims Act allegations. Luciani's letter identifies no defense to those allegations other than the audit being performed by Coding Compliance: "As for the over-billing claim, the hospital has retained an expert to examine the patient charts during the time in question. . . . ."

41. Plaintiff is informed and believes, and on that basis alleges, that in advance of the mediation that occurred on March 6 and March 7, 2006, Luciani made, or implied he had the authority to make, an offer of settlement. Luciani did not have such authority. The mediation was not successful.

### 1. Coding Compliance's Audit Showed No Statistically Significant Errors In Magic Valley's Billing.

42. Coding Compliance Solutions marshaled its resources and got to work. They conducted a statistically valid audit and prepared an expert report in time to meet the new March 24 expert disclosure deadline.

43. Although Luciani had advised the hospital that an audit would only confirm Plaintiffs' claims regarding false billing, in fact the Coding Compliance audit was devastating to Suter and Harmer's case. It showed that there was no statistically significant overbilling at the Transitional Care Unit, and exposed errors in the Nicholson report. It concludes: "CCS was unable to substantiate any of the allegations made by the plaintiffs in their complaint. . . . The

- 13 -

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

basis for the plaintiffs' experts opinions appear to be founded in depositions and they relied on a flawed approach that had no empirical basis. The statistically valid audit performed by CCS found no basis for the allegations as the error rate was less than 1%."

### 2. Suter And Harmer Fired Their Expert After McDermott Elicited Testimony That His Resume Contained Misrepresentations.

44. Russell Hayman of McDermott conducted a deposition of Suter and Harmer's expert, Mr. Nicholson, in June of 2006. Although Mr. Nicholson's CV makes reference to a Master of Arts from the University of Colorado at Boulder, he admitted in his deposition that, in fact, he has no Masters Degree and has no degree from the University of Colorado.

45. As a result of this revelation, Suter and Harmer fired Mr. Nicholson, and filed a motion "to extend deadlines to allow substitution of expert witness." The Court granted the motion, but it also ordered Suter and Harmer to pay a portion of Defendants' costs incurred in responding to the Nicholson opinion. Pursuant to the order, on December 13, 2007, plaintiffs in the underlying action made a payment to the hospital in the amount of roughly $843,000.

46. In sum, in the months since McDermott and Coding Compliance were engaged, they completely reversed Magic Valley's position. In January of 2006, Magic Valley was faced with an expert report showing a potential $22 million in liability, and no plans to hire an expert or prepare a rebuttal report existed. Now, it is armed with a report rebutting those allegations, and plaintiffs in the False Claims Act action have removed their expert and paid $843,000 to the hospital.

### H. Magic Valley Incurred Damages When Its Insurers Refused Payment For Services Provided By McDermott, Will & Emery And Coding Compliance Solutions.

47. Following the crisis in January of 2006, Magic Valley terminated its attorney-client relationship with Luciani. McDermott, Will & Emery is now lead counsel in the *qui tam* action, and the Boise firm of Moffatt, Thomas is acting as lead counsel on the employment aspects of the litigation and as local counsel in the *qui tam* action.

48. Farmers has refused to pay for any services provided by McDermott, Will & Emery or by Coding Compliance Solutions since they were retained on January 30, 2006.

Plaintiff is informed and believes and on that basis alleges that Farmers' decision to deny payment for these costs was made in consultation with Luciani, who continued to be in regular communication with Dave Johnson of LitNeutral after Magic Valley retained the McDermott firm.

49. Travelers has not paid for all of the fees and costs incurred by McDermott, Will & Emery and Coding Compliance Solutions.

50. The fees and costs Magic Valley has incurred and will incur in retaining substitute counsel are directly attributable to the breaches of duty committed by Luciani and his firm. Neither insurance nor the $843,000 payment made by plaintiffs in the underlying litigation have fully compensated the hospital for the McDermott and Coding Compliance fees and costs, which are approximately $4 million and increasing with time.

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty Against All Defendants)

51. Plaintiff incorporates herein by reference each and every allegation contained in paragraphs 1 through 50, above, as though set forth here in full.

52. As alleged above, Defendant Tom Luciani and his firm, Defendant Stamper, Rubens, Stocker & Smith, P.S. entered into an attorney-client relationship with Plaintiff to represent Plaintiff in underlying litigation, including a *qui tam* case alleging violations of the Federal False Claims Act.

53. In their capacity as attorneys for Plaintiff, Defendant Tom Luciani and Defendant Stamper, Rubens, Stocker & Smith, P.S. owed a fiduciary duty to Plaintiff. This fiduciary relationship entitled Magic Valley to trust Luciani and his firm, and imposed upon such defendants the highest duties of care, candor and loyalty, such as to entitle Plaintiff to expect such Defendants' absolute fidelity and selfless loyalty. The fiduciary duty of care obligated Luciani and his firm to give effective representation to Plaintiff through diligence and competence that met all applicable standards of care, including all Rules of Professional Conduct. It also obligated Luciani and his firm to disclose all facts that they knew or should have known would be material

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, INTENTIONAL BREACH OF FIDUCIARY DUTY AND MALPRACTICE

to decisions being made by Magic Valley, and to give advice that put Plaintiff's interests before their own financial or business interests, and before the interests of Farmers.

54.   Luciani and Defendant Stamper, Rubens, Stocker & Smith P.S. breached their fiduciary duty, by among other things:

    a.   acting in concert with Magic Valley's insurer, Farmers, who believed it had no indemnity obligation in the *qui tam* case, to minimize defense costs;

    b.   abiding by Farmers' billing guidelines, which precluded an adequate defense of a complex action under the Federal False Claims Act;

    c.   failing to retain an expert to rebut the allegations of Plaintiffs' expert showing a potential exposure in the *qui tam* case alone of $18 million;

    d.   employing a strategy of blaming co-defendant National Rehab Partners, even though Luciani knew that NRP was insolvent and that the duties allegedly breached by Magic Valley are non-delegable;

    e.   providing coverage advice to Farmers;

    f.   failing to communicate with Magic Valley and keep it apprised of key developments;

    g.   advising Magic Valley that the hospital's exposure was around $300,000-$500,000 while advising Farmers that the exposure in the *qui tam* action could be in the millions;

    h.   treating Farmers, rather than Magic Valley as their client;

    i.   advising Magic Valley, without justification, that it was unnecessary to conduct an audit to rebut the underlying plaintiffs' allegations of false billing;

    j.   communicating an offer of compromise to the underlying plaintiffs without client approval in connection with a mediation in 2006.

55.   At all relevant times, Magic Valley was unaware of the wrongdoing and breaches of fiduciary duty committed by Luciani and his firm, and until late January, 2006 did, in fact, place full and total trust, confidence and reliance upon Luciani and his firm. Magic Valley justifiably relied upon the continuing integrity and fidelity of such Defendants in acting as it did. Magic Valley's conduct was reasonable under all the circumstances.

- 16 -

56. As a direct and proximate result of these breaches of duty, Magic Valley has incurred expenses in retaining replacement counsel in an amount approximately equal to $4 million, or according to proof, and such expenses are continuing to accrue.

57. Defendants Stamper, Rubens, P.S. and Stocker, Smith, Luciani & Staub, P.L.L.C. are liable for these breaches as successors to the firm of Stamper, Rubens, Stocker & Smith, P.S.

## SECOND CAUSE OF ACTION
### (Intentional Breach of Fiduciary Duty Against All Defendants)

58. Plaintiff incorporates herein by reference each and every allegation contained in paragraphs 1 through 57, above, as though set forth here in full.

59. The aforementioned breaches of fiduciary duty were committed willfully and intentionally and committed by means of oppression, fraud (including fraudulent omission) and malice and in conscious disregard of Plaintiffs' rights and of the duties of Luciani and his firm, Stamper, Rubens, Stocker & Smith, P.S.

60. Defendants Stamper, Rubens, P.S. and Stocker, Smith, Luciani & Staub, P.L.L.C. are liable for these intentional breaches of fiduciary duty as successors to the firm of Stamper, Rubens, Stocker & Smith, P.S.

## THIRD CAUSE OF ACTION
### (Professional Malpractice Against All Defendants)

61. Plaintiff incorporates herein by reference each and every allegation contained in paragraphs 1 through 60, above, as though set forth here in full.

62. As alleged above, Defendant Tom Luciani and his firm, Defendant Stamper, Rubens, Stocker & Smith, P.S., entered into an attorney-client relationship with Plaintiff to represent Plaintiff in underlying litigation, including a *qui tam* case alleging violations of the Federal False Claims Act.

63. Luciani and Defendant Stamper, Rubens, Stocker & Smith P.S. breached their duty of loyalty and care, by among other things:

    a. failing to prepare any motion on the pleadings with respect to the *qui tam* action;

- 17 -

        b.      acting in concert with Magic Valley's insurer, Farmers, who believed it had no indemnity obligation in the *qui tam* case, to minimize defense costs;

        c.      abiding by Farmers' billing guidelines, which precluded an adequate defense of a complex action under the Federal False Claims Act;

        d.      failing to retain an expert to rebut the allegations of Plaintiffs' expert showing a potential exposure in the *qui tam* case alone of $18 million;

        e.      employing a strategy of blaming co-defendant National Rehab Partners, even though Luciani knew that NRP was insolvent and that the duties allegedly breached by Magic Valley are non-delegable;

        f.      providing coverage advice to Farmers;

        g.      failing to communicate with Magic Valley and keep it apprised of key developments;

        h.      advising Magic Valley that the hospital's exposure was around $300,000-$500,000 while advising Farmers that the exposure in the *qui tam* action could be in the millions;

        i.      treating Farmers, rather than Magic Valley as their client;

        j.      advising Magic Valley, without justification, that it was unnecessary to conduct an audit to rebut the underlying plaintiffs' allegations of false billing;

        k.      communicating an offer of compromise to the underlying plaintiffs without client approval in connection with a mediation in 2006.

64.     As a direct and proximate result of these breaches of duty, Magic Valley has incurred expenses in retaining replacement counsel in an amount approximately equal to $4 million, or according to proof, and such expenses are continuing to accrue.

Defendants Stamper, Rubens, P.S. and Stocker, Smith, Luciani & Staub, P.L.L.C. are liable for these breaches as successors to the firm of Stamper, Rubens, Stocker & Smith, P.S.

## DEMAND FOR JURY

Plaintiff respectfully requests a trial by jury on each of the claims herein.

## DEMAND FOR ATTORNEY'S FEES

As a consequence of the complaints, causes and claims herein stated, Plaintiff has been

- 18 -

required to retain legal counsel and has incurred, and will incur, costs and attorney's fees related to the prosecution of this action for which Magic Valley is entitled to a separate award of reimbursement pursuant to the provisions of Idaho Code §§ 12-121.

**PRAYER FOR JUDGMENT**

WHEREFORE, Plaintiff prays for judgment, as follows:

1. On the first claim, for damages according to proof in an amount that is now at least $4 million and increasing with the passage of time.

2. On the second claim, for damages according to proof in an amount that is now at least $4 million and increasing with the passage of time.

3. For costs and attorney's fees.

4. For such other relief as this Court deems just and proper.

Dated: January 17TH, 2008

ANDERSON, JULIAN & HULL, LLP

Brian Julian, of the firm
Attorneys for Plaintiff

87079\2002\583585.1